UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SERGEI FEDOROV,

               Plaintiff,                  Case No.

vs.                                   Honorable

HYMAN LIPPITT, P.C., DOUGLAS A.
HYMAN, NORMAN L. LIPPITT, and
BRIAN D. O'KEEFE,

               Defendants.

---

## COMPLAINT AND JURY DEMAND

     Plaintiff Sergei Fedorov, by and through his attorneys, The Googasian Firm, P.C., alleges as follows in his Complaint against Defendants Hyman Lippitt, P.C., Douglas A. Hyman, Norman L. Lippitt, and Brian D. O'Keefe:

### Nature of Action

     1.     This diversity action arises from the acts and omissions of a law firm, Defendant Hyman Lippitt, P.C., ("Hyman Lippitt"), that caused one of its clients, Joseph Zada ("Mr. Zada"), to fleece millions of dollars from another one of its clients, Plaintiff Sergei Fedorov ("Mr. Fedorov"), during the law firm's simultaneous representation of both clients.

     2.     During the time of its representation of Mr. Fedorov from at least 2001 to earlier this year, Hyman Lippitt also represented Mr. Zada in scores of transactions and lawsuits arising from what lawyers at the firm knew others had asserted was a "Ponzi scheme" operated by Mr. Zada. The largest victim of Mr. Zada's misdeeds with regard to money entrusted to him was Hyman

Lippitt's own client, Mr. Fedorov.   Mr. Fedorov was never informed by Hyman Lippitt about what it knew regarding the financial and litigation activities of its client, Mr. Zada,  to whom he had entrusted tens of millions of dollars.   For example, Hyman Lippitt did not disclose to Mr. Fedorov that in 2008 it was representing Mr. Zada in litigation against a man  who had asserted that Mr. Zada was operating a "huge Ponzi scheme" involving the borrowing of "money from investors in a convoluted manner that promises above average 'returns'" that he "never pays . . . back"  and who had  asserted that Mr. Zada had  "a high-powered Detroit law firm on retainer for just these types of 'scrapes.'"

**Parties**

3.      Plaintiff Sergei Fedorov ("Mr. Fedorov") is a citizen of Florida, and is currently living and playing professional hockey in the Russian Federation.

4.      Upon information and belief,   Defendant Hyman Lippitt, P.C., ("Hyman Lippitt") is a Michigan corporation that is registered to do business and engages in business in this judicial district.

5.      Upon information and belief, Defendant Norman L. Lippitt ("Mr. Lippitt") is a citizen of Michigan, and is a resident of this judicial district.

6.      Upon information and belief, Defendant Douglas A. Hyman ("Mr. Hyman") is a citizen of Michigan, and is a resident of this judicial district.

7.      Upon information and belief, Defendant Brian D. O'Keefe ("Mr. O'Keefe") is a citizen of Michigan, and is a resident of this judicial district.

## Jurisdiction and Venue

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

9.    Venue exists pursuant to 28 U.S.C. § 1391.

10.   The amount in controversy exceeds $75,000, exclusive of interests and costs.

## Common Allegations

### Hyman Lippitt Is A Law Firm
### With A Business Practice That Includes Foreign And "Offshore" Investments

11.    Hyman Lippitt is a law firm with a sophisticated business practice.

12.    Hyman Lippitt represents that "we believe that an attorney owes his/her client the very highest degree of skill, diligence and loyalty."

13.    Hyman Lippitt represents that it provides clients with advice and guidance in all phases of business, including entity selection, negotiation and preparation of operational documents, financing, and securities offerings.

14.    Hyman Lippitt represents that it has expertise and extensive experience with private and publicly held corporations, limited liability companies, and partnerships, including corporate transactions, deal structuring, contracts, negotiations, mergers, acquisitions, divestitures and venture capital.

15.    Hyman Lippitt represents that in order to provide complete services to its business clients, the firm utilizes attorneys who practice in areas of securities and finance, among other areas.

16.     Hyman Lippitt represents that it has extensive experience in securities regulation and compliance.

17.     Hyman Lippitt represents that it has participated in private placements on behalf of domestic and foreign issuers, borrowers and lenders in connection with a broad spectrum of transactions.

18.     Hyman Lippitt represents that it has handled foreign offerings, and that it has significant experience with securities regulation and compliance with federal and state securities laws, including broker-dealer registration and Investment Adviser Act compliance.

19.     Hyman Lippitt maintains or has maintained an "offshore practice" for clients.

20.     Hyman Lippitt represents that its lawyers have published numerous articles in the publication, <u>Offshore Finance U.S.A.</u>

21.     Hyman Lippitt represents that clients involved in its "offshore practice" are required to provide a banking letter of reference and one or more letters of reference from licensed professionals who have known the client for a minimum period of five years.

22.     Hyman Lippitt represents that in all cases in which offshore clients are proposing to transfer funds to offshore accounts or entities, they are required to provide a personal financial statement prepared by a duly licensed certified public accountant or chartered accountant.

23.     Hyman Lippitt represents that it asks its offshore clients to provide it with investment brochures, business plans, articles and other secondary "know your client" material which the firm maintains in a permanent file.

24.     Due to its expertise and experience providing complete services to business clients, specifically including expertise in securities laws and in its "offshore practice," Hyman Lippitt is aware of the legal requirements imposed on clients who invest others' money in private, foreign investments.

25.     At all relevant times, Hyman Lippitt knew or should have known that one of its clients, Mr. Zada, was not in compliance with legal requirements necessary to invest others' money in private, foreign investments.

### Since At Least 1999, Hyman Lippitt Has Represented Mr. Zada, Who Is An Aspiring Horse Trainer Who Appears To Live A Life Of Immense Wealth

26.     Since at least approximately 1999, the lawyers at Hyman Lippitt, specifically including Mr. Lippitt and Mr. Hyman, have represented Mr. Zada, who is a former manager of a limousine company and now an aspiring horse trainer with a high school education.

27.     Hyman Lippitt, Mr. Lippitt and Mr. Hyman each have had an attorney-client relationship with Mr. Zada since at least approximately 1999.   Mr. O'Keefe also has  had an attorney-client relationship with Mr. Zada, along with other attorneys at the firm, including Julie Lyons Kosovec, Lawrence S. Flaggman and Daniel J. McCarthy.

28.     During approximately the last decade,  Mr. Zada has enjoyed an ascent to a life of immense and inexplicable wealth, characterized by mansions in Grosse Pointe, Michigan and Palm Beach, Florida, expensive cars, jewelry and horses, and lavish parties and travel.

**Hyman Lippitt Has Known For Many Years About
Mr. Zada's Practice Of Taking Large Sums Of Money From Friends
And His Claim That He Is Due A Large Inheritance**

29.    Through its representation of Mr. Zada for a decade, Hyman Lippitt has known that Mr. Zada actually has not participated in private, foreign investments with the money provided to him by friends and others.

30.    Through its representation of Mr. Zada for a decade, Hyman Lippitt has known that Mr. Zada is not registered, authorized or licensed to make private, foreign investments on behalf of others.

31.    Through its representation of Mr. Zada for a decade, Hyman Lippitt has known of Mr. Zada's practice of obtaining large sums of money from friends and others.

32.    Through its representation of Mr. Zada for a decade, Hyman Lippitt has known that numerous friends and others have asserted that Mr. Zada has obtained large sums of money from them by representing that the money would be put into private, foreign investments in which he was involved.

33.    Through its representation of Mr. Zada for a decade, Hyman Lippitt has known that people who have entrusted Mr. Zada with large sums of money have later accused him of operating a "Ponzi scheme."

34.    On multiple occasions, Hyman Lippitt has represented Mr. Zada in matters arising from large debts that Mr. Zada has incurred, including multiple claims asserted by friends of Mr. Zada seeking a return of money that Mr. Zada had represented that he was investing in private, foreign investments in which he was participating.

-6-

35.    On multiple occasions, Hyman Lippitt has asserted on Mr. Zada's behalf that large sums of money provided to him actually were personal loans to remedy Mr. Zada's "cash flow" problems, rather than funds provided for private, foreign investments in which he was participating.

36.    Through its representation of Mr. Zada for a decade, Hyman Lippitt also has become aware of Mr. Zada's assertions that he soon will be inheriting hundreds of millions of dollars from a foreign land.    In fact, Hyman Lippitt has also made these same assertions to others.  On multiple occasions, Hyman Lippitt has asserted to others that it is assisting Mr. Zada in connection with this purported expectancy.

37.    On multiple occasions, Hyman Lippitt has opposed efforts by others to obtain information through legal discovery about Mr. Zada's use of money that he has obtained from others and about Mr. Zada's supposed inheritance.   Hyman Lippitt also has undertaken efforts to avoid public disclosure of details of Mr. Zada's supposed inheritance.

38.    By opposing efforts by others to discover facts regarding Mr. Zada's use of money obtained from others and about Mr. Zada's supposed inheritance, Hyman Lippitt has provided substantial assistance to Mr. Zada's ongoing commission of wrongful acts, including, but not limited to, his breach of fiduciary duties owed to Mr. Fedorov.

**Hyman Lippitt Simultaneously Represented Both Mr. Zada and Mr. Fedorov**

39.    From at least 2001 until earlier this year, the lawyers at Hyman Lippitt, specifically including Mr. Lippitt and Mr. O'Keefe, also represented Mr. Fedorov.

40.     Upon information and belief, the person from whom Mr. Zada has obtained the largest amount of money in the last decade is Mr. Fedorov, who is a world-famous professional hockey player.

41.     Mr. Zada literally brought Mr. Fedorov to Hyman Lippitt to propose that Mr. Fedorov begin using the same law firm for legal work.

42.     Mr. Zada introduced Mr. Fedorov to Hyman Lippitt, which started representing Mr. Fedorov promptly thereafter.

43.     From at least 2001 until earlier this year, Hyman Lippitt, Mr. Lippitt and Mr. O'Keefe each have had an attorney-client relationship with Mr. Fedorov.

44.     From at least 2001 until earlier this year, Hyman Lippitt and Mr. Lippitt each simultaneously had attorney-client relationships with Mr. Zada and with Mr. Fedorov.

**Starting In 2001, Hyman Lippitt Represented Mr. Fedorov In All Legal Matters**

45.     From at least 2001 until earlier this year, Hyman Lippitt provided legal representation to Mr. Fedorov in all matters, including, but not limited to, contracts, real estate, tax, estate planning, legal residency, charity, litigation, wire transfers of funds, and even routinely paying bills on his behalf.

46.     Hyman Lippitt's billing timekeeper for the firm's bills to Mr. Fedorov was Mr. Lippitt.

47.     Additional Hyman Lippitt attorneys billed Mr. Fedorov for legal services, including, but not limited to, Mr. O'Keefe, Joseph Pia, H. Joel Newman, Lawrence S. Flaggman, Michael G. Milliman, and David Senawi.

48.     On numerous occasions, Hyman Lippitt has wired money belonging to Mr. Fedorov to Mr. Zada, after Mr. Zada represented to Mr. Fedorov that he was involved in private, foreign investments.

49.     In 2003, Hyman Lippitt assisted Mr. Fedorov in establishing one or more bank accounts at The Private Bank in Bloomfield Hills.

50.     Also in 2003, Hyman Lippitt prepared a Durable Power of Attorney for Mr. Fedorov to sign.

51.     On or about June 19, 2003, Mr. Fedorov signed the Durable Power of Attorney document prepared by Hyman Lippitt.

52.     Through Mr. Fedorov's execution of the Durable Power of Attorney document, Mr. O'Keefe of Hyman Lippitt purportedly obtained broad authority to perform acts and exercise powers with regard to Mr. Fedorov's property and affairs.

53.     The document provided that Mr. O'Keefe "shall exercise all powers in [Mr. Fedorov's] best interest and for [Mr. Fedorov's] welfare."

54.     On numerous occasions after June 19, 2003, Mr. O'Keefe wrote checks from Mr. Fedorov's accounts at The Private Bank.

55.     On numerous occasions after June 19, 2003, Mr. O'Keefe authorized wire transfers of large sums of money from Mr. Fedorov's Private Bank Accounts to Mr. Zada.

56.     On numerous occasions after June 19, 2003, Mr. O'Keefe signed documents, including loan documents and forbearance agreements, purportedly on Mr. Fedorov's behalf relating to the transfer of large sums of money to Mr. Zada.

57.     By executing such documents, Mr. O'Keefe provided a means for creditors of Mr. Zada to attempt to attempt to collect money from Mr. Fedorov to pay debts owed by Mr. Zada.

58.     On numerous occasions after June 19, 2003, Mr. O'Keefe signed documents, including loan documents and forbearance agreements, purportedly on Mr. Fedorov's behalf that imposed financial obligations and risks on Mr. Fedorov to others relating to large sums of money obtained by Mr. Zada.

59.     On numerous occasions after June 19, 2003, Mr. O'Keefe signed documents purportedly on Mr. Fedorov's behalf that placed Mr. Fedorov at risk of having multi-million dollar claims asserted against him with regard to large sums of money obtained by Mr. Zada.

60.     Hyman Lippitt's bills for legal services rendered to Mr. Fedorov were routinely sent to Mr. O'Keefe at the firm's address.   Mr. O'Keefe would sign checks on Mr. Fedorov's behalf, paying his firm.

61.     At all relevant times, a fiduciary relationship existed between Hyman Lippitt and Mr. Fedorov, between Mr. Lippitt and Mr. Fedorov, and between Mr. O'Keefe and Mr. Fedorov.   Mr. Fedorov  placed faith, confidence and trust in Hyman Lippitt, Mr. Lippitt and Mr. O'Keefe.

**During Hyman Lippitt's Representation Of Both Mr. Zada And Mr. Fedorov,**
**Mr. Fedorov Entrusted Tens Of Millions Of Dollars To Mr. Zada That Is Now Missing**

62.     During the time that Hyman Lippitt represented both Mr. Zada and Mr. Fedorov, Mr. Fedorov entrusted tens of millions of dollars to Mr. Zada.   Mr. Zada obtained this money from Mr. Fedorov by representing that the money would be put into private, foreign investments in which he was involved.   The money is now missing.

63.      During the time that Hyman Lippitt represented both Mr. Zada and Mr. Fedorov, Hyman Lippitt knew that Mr. Fedorov is a Russian-born individual with limited formal education and limited knowledge of, and experience in, investment, legal and financial matters.

64.      During the time that Hyman Lippitt represented both Mr. Zada and Mr. Fedorov, Mr. Zada had a fiduciary relationship with Mr. Fedorov in which Mr. Fedorov placed faith, confidence and trust in Mr. Zada and in Mr. Zada's investment advice and ability.

65.      During the time that Hyman Lippitt represented both Mr. Zada and Mr. Fedorov, Hyman Lippitt was aware of the fiduciary duties that Mr. Zada owed to Mr. Fedorov.

66.      During the time that Hyman Lippitt represented both Mr. Zada and Mr. Fedorov, Hyman Lippitt was aware of the confidence and trust that Mr. Fedorov placed in Mr. Zada.

67.      Mr. Zada now owes Mr. Fedorov more than $60 million, but has failed to pay it.  Mr. Zada has publicly stated that he is not able to pay Mr. Fedorov the money that he owes him.

68.      Mr. Zada has breached his fiduciary duties to Mr. Fedorov in numerous ways, including, but not limited to, by failing to act in good faith and with loyalty, by failing to safeguard all funds entrusted to him by Mr. Fedorov, and by failing to protect Mr. Fedorov's business interests over Mr. Zada's personal interest.

69.      During the time that Hyman Lippitt represented both Mr. Zada and Mr. Fedorov, Hyman Lippitt, Mr. Lippitt and Mr. Hyman  participated in and provided substantial assistance to Mr. Zada's breach of fiduciary duty and other tortious and wrongful conduct with regard to Mr. Fedorov, resulting in Mr. Fedorov's loss of tens of millions of dollars.

70.    During the time that Hyman Lippitt represented both Mr. Zada and Mr. Fedorov, Hyman Lippitt, Mr. Lippitt and Mr. O'Keefe also each breached fiduciary duties owed to Mr. Fedorov in numerous ways, including, but not limited to, by failing to act in good faith and with loyalty, by failing to safeguard all funds entrusted to them by Mr. Fedorov, and by failing to protect Mr. Fedorov's business interests over the interests of Hyman Lippitt or others, including Mr. Zada.

### Hyman Lippitt Had A Conflict Of Interest In Its Representation Of Both Mr. Fedorov And Mr. Zada

71.    Hyman Lippitt had an ongoing and recurring series of conflicts of interest in their simultaneous representation of both Mr. Fedorov and Mr. Zada.

72.    The conflicts of interest were nonconsentable.

73.    Hyman Lippitt did not, and could not, obtain informed consent to or a waiver of the conflicts from Mr. Fedorov.

74.    Hyman Lippitt failed to disclose the nature and extent of the conflicts to Mr. Fedorov.

75.    Hyman Lippitt did not properly consult with Mr. Fedorov about the conflicts.

76.    Hyman Lippitt did not, and could not, obtain informed consent from Mr. Fedorov to representation after consultation and disclosure of the conflicts, including, but not limited to, the implications of common representation and the advantages and risks involved.

77.    Hyman Lippitt did not, and could not, determine that a disinterested lawyer would conclude that Mr. Fedorov should agree to be represented by the law firm that represented Mr. Zada under the circumstances.

78.    Hyman Lippitt did not reasonably believe that its representation of Mr. Zada would not adversely affect its relationship with Mr. Fedorov.

79.    Hyman Lippitt did not reasonably believe that its representation of Mr. Fedorov would not be materially limited by its responsibilities to Mr. Zada.

80.    In 2007, Hyman Lippitt sought for the first time to obtain from Mr. Fedorov a purported and ineffective written waiver of the nonconsentable conflicts, approximately six years after it had begun representing both Mr. Fedorov and Mr. Zada.

81.    In 2009, Hyman Lippitt represented simultaneously both Mr. Fedorov's and Mr. Zada's conflicting interests in an aggregate settlement of all of Mr. Fedorov's claims against Mr. Zada for $60 million ("the $60 Million Agreement").

82.    Since execution of the $60 Million Agreement in March 2009, Mr. Zada has failed to pay Mr. Fedorov any of the $60 million he owes him.

83.    Hyman Lippitt had a conflict of interest in its representation of both Mr. Fedorov and Mr. Zada in the $60 Million Agreement.

84.    The conflict with regard to the $60 Million Agreement was nonconsentable.

85.    Hyman Lippitt did not, and could not, obtain informed consent to or a waiver of the conflict from Mr. Fedorov with regard to the $60 Million Agreement.

86.    Hyman Lippitt did not properly consult with Mr. Fedorov about the conflict with regard to the $60 Million Agreement.

87.    Hyman Lippitt did not, and could not, obtain informed consent from Mr. Fedorov to representation in the $60 Million Agreement after consultation and disclosure of the conflicts,

including, but not limited to, the implications of common representation and the advantages and risks involved.

88.    Hyman Lippitt did not, and could not, determine that a disinterested lawyer would conclude that Mr. Fedorov should agree to be represented in the $60 Million Agreement by the law firm that represented Mr. Zada under the circumstances.

89.    Hyman Lippitt did not reasonably believe that its representation of Mr. Zada in the $60 Million Agreement would not adversely affect its relationship with Mr. Fedorov

90.    In March 2009, on the day that the firm tendered the $60 Million Agreement to Mr. Fedorov for signature, Hyman Lippitt also sought to obtain a purported and ineffective waiver of the nonconsentable conflict from Mr. Fedorov.

91.    Hyman Lippitt  tendered these purported and ineffective waivers in 2007 and 2009 to Mr. Fedorov at the same time that it tendered to him transactional documents with regard to which it had a conflict.    At the time of these tenders to Mr. Fedorov,  Hyman Lippitt knew that a federal judge had previously found in a written opinion that it was "inappropriate" for the firm  to tender to a client a conflict waiver document on the same day that it was tendering for signature to the client the transactional documents over  which it had a conflict.

### At Least One Hyman Lippitt Attorney Was Concerned About Mr. Zada's Practice Of Obtaining Large Sums Of Money From Mr. Fedorov, But Was Also Concerned About  Jeopardizing The Firm's Relationship With Mr. Zada

92.    During the time that Hyman Lippitt represented both Mr. Zada and Mr. Fedorov, one or more  attorneys at Hyman Lippitt harbored concerns about the propriety of Mr. Zada's practice of obtaining large sums of money from their own client, Mr. Fedorov.

-14-

93.     In a self-serving file memo dated October 21, 2003 ("the 2003 Memo") that was not shown to Mr. Fedorov, one attorney wrote that he had endeavored unsuccessfully to learn more about these Zada-Fedorov transactions from Mr. Fedorov (but apparently not from Mr. Zada, the client purportedly making the investments on behalf of Mr. Fedorov about which the attorney had concerns.)

94.     The 2003 Memo made no reference to the many facts about which Hyman Lippitt was aware regarding Mr. Zada's use of others' money, including the firm's recent involvement in litigation on Mr. Zada's behalf in which a man had obtained a $1.5 judgment against Mr. Zada in a lawsuit alleging that Mr. Zada had committed fraud in obtaining money for what Mr. Zada had said was a private, foreign investment in which he was involved.

95.     The 2003 Memo further stated that both "Joe and Sergei are Norman's clients, and Joe referred Sergei to our office."

96.     The 2003 Memo further stated that the attorney had not sent Mr. Fedorov a letter regarding his concerns about the transfers of money being made to Mr. Zada " as it would appear offensive to him and could jeopardize the relationship between Sergei [Fedorov] and Joe [Zada] and between Joe [Zada] and our firm."

97.     After October 21, 2003, Mr. Zada continued to obtain and be entrusted with many millions of dollars from Mr. Fedorov by representing that the money was for private, foreign investments in which he was involved.

**Hyman Lippitt, Mr. Hyman, and Mr. Lippitt**
**Participated In And Substantially Assisted Mr. Zada's**
**Breach Of Fiduciary Duties to Mr. Fedorov**

98.     Hyman Lippitt, Mr. Hyman and Mr. Lippitt participated in and provided substantial assistance to Mr. Zada's breach of fiduciary duty and other tortious and wrongful conduct with regard to Mr. Fedorov and the money obtained from him, resulting in Mr. Fedorov's loss of tens of millions of dollars.

99.     Hyman Lippitt, Mr. Hyman and Mr. Lippitt profited from Mr. Zada's breach of fiduciary duty to Mr. Fedorov through payment of fees for legal services provided to Mr. Zada and to Mr. Fedorov.

100.     Hyman Lippitt, specifically including Mr. Lippitt, Mr. Hyman and Mr. O'Keefe, repeatedly became aware of facts regarding Mr. Zada's transactions and legal disputes with others pertaining to money that he had borrowed that the firm and its attorneys did not disclose to Mr. Fedorov, who was continuing to transfer large sums of money to Mr. Zada based on representations that the money would be put into private, foreign investments in which he was involved.

101.     During the time that Hyman Lippitt represented both Mr. Zada and Mr. Fedorov, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, facts regarding the non-existence of the private, foreign investments in which Mr. Zada would represent to Mr. Fedorov and others that he and they were participating.

102.     During the time that Hyman Lippitt represented both Mr. Zada and Mr. Fedorov, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that Mr. Zada had asserted in legal disputes in which he was represented by Hyman Lippitt that large sums of money borrowed from

-16-

friends were simply personal loans to assist him with cash flow problems, rather than amounts provided to him for private, foreign investments.

103.    At all relevant times, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that Mr. Zada was not involved in making private, foreign investments with the large sums of money that he was obtaining from friends and others, including Mr. Fedorov.

104.    At all relevant times, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that Mr. Zada was not registered or licensed to make private, foreign investments for people from whom he was obtaining large sums of money.

105.    At all relevant times, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that Mr. Zada was not authorized under federal or state securities laws to make private, foreign investments for people from whom he was obtaining large sums of money.

106.    By at least 2001, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that Mr. Zada had testified in depositions that he was a horse trainer and equestrian and that he was not involved in making private, foreign investments for people.   Hyman Lippitt and Mr. Lippitt defended Mr. Zada in depositions in which he made such statements.

107.    In one example, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that a $1.5 million judgment had been entered against Mr. Zada in 2002 in a Wayne County lawsuit in which a friend of Mr. Zada had asserted claims of breach of contract and fraud arising from Mr. Zada having obtained a large sum of money for what Mr. Zada had said would be participation in a private, foreign investment ("the Wayne County Lawsuit").    Hyman Lippitt and Mr. Lippitt represented Mr. Zada in the lawsuit that resulted in entry of a $1.5 million judgment against Mr. Zada.

108.    Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that Hyman Lippitt had asserted on Mr. Zada's behalf in the Wayne County Lawsuit that "this so-called international investment was not reality," that "there is no international investment," and that Mr. Zada was using the large sums of money obtained from friends "for personal purposes and house renovations" after Mr. Zada "experienced a short-term cash flow difficulty."

109.    At or around the time of entry of the $1.5 million judgment against Mr. Zada in the Wayne County Lawsuit, Mr. Zada obtained more than $2 million from Mr. Fedorov by representing that the money would be put into private, foreign investments in which he was involved.    Upon information and belief, Mr. Zada used the money obtained from Mr. Fedorov to meet his obligations to pay a $1.5 million judgment in the Wayne County Lawsuit.

110.    In another example, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that both Mr. Zada and Hyman Lippitt had been sued in 2005 in the United States District Court for the Eastern District of Michigan by a man who alleged that he was a client of Hyman Lippitt and alleged that Mr. Zada had improperly obtained $600,000 following a transaction in which he was involved ("the Eastern District Lawsuit").

111.    Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that in the Eastern District Lawsuit,  Mr. Zada had testified that he was only involved in the horse business, and that the money at issue in the litigation was borrowed due to a "cash flow shortage."

112.    Hyman Lippitt  knew, but did not disclose to Mr. Fedorov, that in the Eastern District Lawsuit, Mr. Zada had been ordered by a federal judge in 2006 to appear again for deposition after

Mr. Zada had "refused to answer a variety of questions concerning his bank accounts, and the timing, amount and purpose of various payments and loans made to him."

113.    Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that in the Eastern District Lawsuit, Mr. Zada had been ordered by a federal judge in 2006 to appear again for deposition to answer "questions concerning the size, timing, amount, and purpose of payments and loans" and "questions about [Mr. Zada's] personal financial accounts."

114.    Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that in the Eastern District Lawsuit, Mr. Zada had been ordered by a federal judge to answer these additional questions in a deposition to be conducted at the Theodore Levin U.S. Courthouse in Detroit on August 25, 2006.

115.    Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that in the Eastern District Lawsuit, a settlement among the parties was reached and placed on the record in Court on August 25, 2006 that mooted the requirement of Mr. Zada appearing for deposition that same day to answer the questions about his finances as ordered by the federal judge.    Upon information and belief, both Mr. Zada and Hyman Lippitt contributed money to the settlement.

116.    Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that in the Eastern District Lawsuit, Mr. Zada agreed to pay to the Plaintiff in settlement a sum of $725,000.    Upon information and belief, pursuant to Mr. Zada's agreement to pay the Plaintiff in the Eastern District Lawsuit, Mr. Zada was required to pay $200,000 on October 30, 2006; $200,000 on December 5, 2006; $200,000 on January 30, 2007; and $125,000 on March 1, 2007.    The agreement provided Mr. Zada would have a five-day grace period to make those payments.

117.    Thereafter, at or around the date on which settlement payments from the Eastern District Lawsuit were due, Mr. Zada obtained sums of money from Mr. Fedorov by representing that the money would be put into private, foreign investments in which he was involved. Upon information and belief, Mr. Zada used the money obtained Mr. Fedorov to pay his obligations under the settlement in the Eastern District Lawsuit.

118.    Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that Mr. Zada had established one or more relationships with banks that had subsequently agreed to give Mr. Zada money after Mr. Zada asserted that he soon would be inheriting hundreds of millions of dollars from a foreign land.

119.    By at least 2004, Hyman Lippitt had asserted to others, but not disclosed to Mr. Fedorov, that it was assisting Mr. Zada in connection with this purported expectancy of hundreds of millions of dollars from a foreign land. In one such communication in June 2004 to the president of a bank, Mr. Lippitt wrote on behalf of his client, Mr. Zada, that he was "very familiar with his business and personal life." Mr. Lippitt stated in part, "I have been working on this inheritance for over two years. I have seen independent documentation [of the value of the inheritance]. . . ." According to Mr. Lippitt's 2004 letter, Mr. Zada's inheritance is "far in excess" of $250 million, and Hyman Lippitt is "currently engaged in discussions that will lead to Joe actually receiving the inheritance, which hopefully will not be too far in the distant future."

120.    As recently as early 2009, Mr. Lippitt reiterated to others that the effort to collect a large inheritance for Mr. Zada as ongoing. Mr. Lippitt also acknowledged to others that some people think the inheritance is nothing more than a scheme.

121.    Upon information and belief, no such inheritance has been obtained by Mr. Zada in whole or in part during the more than seven years that Hyman Lippitt has asserted it has been representing Mr. Zada in this regard.

122.    Hyman Lippitt also knew, but did not disclose to Mr. Fedorov, that many other friends of Mr. Zada were claiming to be owed large sums of money that they had provided after Mr. Zada had represented that the money would be put into private, foreign investments in which he was involved.

123.    For example, in 2008, Hyman Lippitt and Mr. Hyman sought in an action filed in Oakland County Circuit Court to enjoin a Michigan man who allegedly had been placing signs on Mr. Zada's property in Florida and Michigan stating, "JOE ZADA DEADBEAT." The Michigan man against whom the injunction was sought also had allegedly drafted a flyer in 2008 that stated in part:

> You might have heard of the guy that lives . . . at [house number omitted] Lakeshore Drive [in Grosse Pointe Shores.] His name is Joseph Paul Zada and he has built quite the reputation as a 'shooter.' . . . . Beware. The money for all of that and lots of jetsetting comes from a huge Ponzi scheme. Mr. Zada 'borrows' money from investors in a convoluted manner that promises above average 'returns." The catch? He never pays it back! Are there multiple promises? Of course there are. . . .
> There are many such people scattered across the country, their retirements in jeopardy, making futile phone calls to the ever more defiant and elusive 'philanthropist.' His sparse return calls offer only excuses and future litigation, in which he hopes to tie up the victim for years in the courts. His daddy keeps a high-powered Detroit law firm on retainer for just these types of 'scrapes' . . . .

Mr. Zada eventually dismissed litigation seeking injunctive relief against the Michigan man, with Mr. Zada being ordered to pay costs to the man.

-21-

124.    In a related action brought in 2008 in  Wayne County Circuit Court by the same Michigan man against Mr. Zada, a $1.8 million judgment subsequently was entered against Mr. Zada in favor of the Michigan man.    Hyman Lippitt and Mr. Hyman represented Mr. Zada in the case, which resulted in the $1.8 million judgment against Mr. Zada.

125.    Hyman Lippitt also knew, but did not disclose to Mr. Fedorov, that Mr. Zada was in legal disputes with multiple other creditors who claimed to be owed large sums of money by Mr. Zada.

126.    For example, in 2008, Hyman Lippitt and Mr. Hyman represented Mr. Zada's interests in Wayne County Circuit Court in a lawsuit brought by American Express for more than $600,000 in charges.    A judgment against Mr. Zada was entered in the case, and garnishment efforts were initiated against Mr. Zada by January 2009.

127.    In another example, in early 2009,  Hyman Lippitt and Lawrence S. Flaggman represented Mr. Zada's interests in a dispute with  a Florida man that resulted in Mr. Zada agreeing to pay the man more than $1 million within 35 days.    The Florida man is now pursuing claims against Mr. Zada for allegedly presenting the man with a worthless check in connection with the agreement, after Hyman Lippitt was notified that Mr. Zada's check had been dishonored.

128.    Hyman Lippitt also knew, but did not disclose to Mr. Fedorov, that in early 2009, at the same time that it was preparing the $60 Million Agreement between Mr. Zada and Mr. Fedorov, the firm was contemporaneously preparing similar settlement documents on behalf of Mr. Zada with regard to debts owed to numerous other people.    Upon information and belief, Hyman Lippitt prepared other settlement documents during this time frame that obligated Mr. Zada to pay millions

of dollars to others both prior to and shortly after the date on which $60 Million Agreement required Mr. Zada to pay Mr. Fedorov.

129.    For example, on or about March 7, 2009, Mr. Zada signed a "Payment, Release, Standstill, Waiver of Defenses, and Confidentiality Agreement" prepared by Hyman Lippitt that obligated him to pay a New York man  $2 million or before April 2, 2009.    This agreement was substantially similar in form to the $60 Million Agreement  signed by Mr. Zada and prepared and tendered by Hyman Lippitt for signature by Mr. Fedorov on or about March 10, 2009, that obligated Mr. Zada to pay Mr. Fedorov $60 million on a date  after April 2, 2009.

130.    Upon information and belief, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, that Mr. Zada was obligated to pay other creditors many millions of dollars pursuant to settlements  and/or judgments on dates earlier than the date for payment reflected in  Mr. Zada's $60 Million Agreement with Mr. Fedorov that Hyman Lippitt prepared and tendered to Mr. Fedorov for signature.

131.    Upon information and belief, Hyman Lippitt also knew, but did not disclose to Mr. Fedorov, that multiple other judgments were entered against Mr. Zada in early 2009, including, but not limited to, a $409,076 judgment, and two separate $4 million judgments, all on behalf of friends of Mr. Zada who had provided money to him after he represented that the money would be put into private, foreign investments in which he was involved.

132.    Upon information and belief, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, from numerous other communications, disputes and/or lawsuits that Mr. Zada actually was

not involved in making private, foreign investments with the large sums of money that he was obtaining from friends and others, including Mr. Fedorov.

133.    Upon information and belief, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, from numerous other communications, disputes and/or lawsuits that Mr. Zada claimed that large sums of money obtained from friends and others were simply loans for his own personal use to address, among other things, "cash flow shortages."

134.    Upon information and belief, Hyman Lippitt knew, but did not disclose to Mr. Fedorov, from numerous other communications, disputes and/or lawsuits that Mr. Zada had opposed legal discovery into his finances sought by people and entities to whom he owed money.

135.    Hyman Lippitt also has represented Mr. Zada in matters directly adverse to Mr. Fedorov while Mr. Fedorov was also a client of the firm.

136.    For example, in early 2009, Hyman Lippitt objected to and refused to provide discovery sought from Mr. Zada, Hyman Lippitt and Mr. Lippitt by additional attorneys for Mr. Fedorov in litigation arising from bank loans relating to Mr. Fedorov and Mr. Zada. Hyman Lippitt, Mr. Hyman and Mr. Lippitt objected to and refused to provide discovery sought by Mr. Fedorov relating to Mr. Zada's finances and supposed inheritance in the bank litigation.

137.    In numerous ways, including, but not limited to the foregoing, Hyman Lippitt, Mr. Hyman and Mr. Lippitt participated in and provided substantial assistance to Mr. Zada's breach of fiduciary duty and other tortious and wrongful conduct with regard to Mr. Fedorov and the money obtained from him, resulting in Mr. Fedorov's loss of tens of millions of dollars.

**Count I**

**Aiding and Abetting Breach of Fiduciary Duty**
**By Hyman Lippitt, Mr. Hyman and Mr. Lippitt**

138.    The preceding allegations are hereby incorporated by reference.

139.    At all relevant times, Mr. Zada owed a fiduciary duty and obligation to Mr. Fedorov with regard to the tens of millions of dollars that Mr. Fedorov entrusted to Mr. Zada.

140.    Mr. Zada breached his fiduciary duties to Mr. Fedorov, and has agreed that he now owes Mr. Fedorov $60 million that he has failed to pay.

141.    Hyman Lippitt, Mr. Hyman and Mr. Lippitt each participated in and/or provided substantial assistance to Mr. Zada's breach of fiduciary duty.

142.    Hyman Lippitt, Mr. Hyman and Mr. Lippitt profited from Mr. Zada's breach of fiduciary duty through the payment of fees for legal services provided to Mr. Zada and Mr. Fedorov.

143.    The breach has caused Mr. Fedorov tens of millions of dollars in harm.

144.    As a direct and proximate result of Hyman Lippitt, Mr. Hyman and Mr. Lippitt aiding and abetting in Mr. Zada's breach of fiduciary duty, Mr. Fedorov has suffered tens of millions of dollars of damage.

**Count II**

**Breach of Fiduciary Duty**
**By Hyman Lippitt, Mr. Lippitt, and Mr. O'Keefe**

145.    The preceding allegations are hereby incorporated by reference.

146.    At all relevant times, Hyman Lippitt, Mr. Lippitt and Mr. O'Keefe each owed a fiduciary duty and obligation to Mr. Fedorov.

147.    Hyman Lippitt, Mr. Lippitt and Mr. O'Keefe breached their duty to Mr. Fedorov.

148.    The breach has caused Mr. Fedorov tens of millions of dollars in harm.

149.    As a direct and proximate result of the breach of fiduciary duty by Hyman Lippitt, Mr. Lippitt and Mr. O'Keefe, Mr. Fedorov has suffered tens of millions of dollars of damage.

### Count III

### Attorney Malpractice
### By Hyman Lippitt, Mr. Lippitt, and Mr. O'Keefe

150.    The preceding allegations are hereby incorporated by reference.

151.    At all relevant times, Hyman Lippitt, Mr. Lippitt and Mr. O'Keefe each had an attorney-client relationship with Mr. Fedorov.

152.    At all relevant times, Hyman Lippitt, Mr. Lippitt and Mr. O'Keefe each owed a duty to Mr. Fedorov.

153.    Hyman Lippitt, Mr. Lippitt and Mr. O'Keefe negligently breached the duty owed to Mr. Fedorov.

154.    The breach has caused Mr. Fedorov tens of millions of dollars in harm.

155.    As a direct and proximate result of the negligent breach by Hyman Lippitt, Mr. Lippitt and Mr. O'Keefe, Mr. Fedorov has suffered tens of millions of dollars of damage.

WHEREFORE, Plaintiff prays that this Court enter judgment in his favor, and against

Defendants for whatever damages Plaintiff is found to be entitled to recover, plus interest, costs and

attorney's fees, including, but not limited to, direct damages, incidental damages, consequential

damages, exemplary damages, attorneys fees, and any other or further relief the Court deems just.

THE GOOGASIAN FIRM, P.C.

By /s/ Thomas H. Howlett
   George A. Googasian  (P14185)
   Thomas H. Howlett (P57346)
   Dean M. Googasian (P53995)
Attorneys for Plaintiffs
6895 Telegraph Road
Bloomfield Hills, MI  48301-3138
248/540-3333
E-mail: thowlett@googasian.com
      dgoogasian@googasian.com

Dated: October 15, 2009

## JURY DEMAND

Plaintiff Sergei Fedorov, by and through his attorneys, The Googasian Firm, P.C., hereby

demands a trial by jury in the above entitled cause.

THE GOOGASIAN FIRM, P.C.

By/s/ Thomas H. Howlett
George A. Googasian  (P14185)
Thomas H. Howlett (P57346)
Dean M. Googasian (P53995)
The Googasian Firm, P.C.
Attorneys for Plaintiff
6895 Telegraph Road
Bloomfield Hills, MI 48301-3138
248/540-3333
E-mail: thowlett@googasian.com
dgoogasian@googasian.com

Dated: October 15, 2009